UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

IN RE: M/V RAM XVII

CIVIL ACTION NO. 6:22-cv-0998

JUDGE S. MAURICE HICKS, JR.

MAGISTRATE JUDGE AYO

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment filed by Aries Marine Corporation ("Aries Marine"). See Record Document 81. Specifically, Aries Marine argues there is no genuine issue of material fact that Dylan Rose ("Rose") is not a seaman but is a maritime worker covered under the Longshore Harbor Workers Compensation Act ("LHWCA"). See Record Document 81-1 at 8. Thus, Aries Marine submits it is entitled to summary judgment in its favor dismissing Rose's claim for unseaworthiness. See id. Rose filed an opposition See Record Document 93. Aries Marine replied. See Record Document 102. For the reasons set forth below, the Motion for Summary Judgment (Record Document 81) is **GRANTED**. Rose's claims against Aries Marine are hereby **DISMISSED WITH PREJUDICE**.

**BACKGROUND**

In November of 2019, Lloyd Engineering, Inc. ("LEI") contracted with Tolunay-Wong Engineers, Inc. ("TWE") to conduct geotechnical studies of soil core samples in the Gulf of Mexico off the coast of Texas ("the LEI/TWE Contract"). See Record Document 55 at 2. In December of 2019, TWE subcontracted with Amdrill Inc. ("Amdrill") to provide

the crew and equipment to drill for and obtain the soil core samples to be studied for the LEI/TWE Contract ("the TWE/Amdrill Contract"). See id. In December of 2019, LEI entered into a time charter agreement with Aries Marine to charter a liftboat, the M/V Ram XVII, to provide transportation, a work platform, and living quarters for LEI, TWE, and Amdrill personnel in support of the LEI/TWE and TWE/Amdrill Contracts ("the Charter Agreement"). See id.

On December 2, 2019, Aries Marine and TWE entered into a contract titled "Indemnity and Hold Harmless Agreement (Boarding Agreement) ("the Boarding Agreement"), in which Aries Marine, as owner of the various vessels, and TWE agree to allocate risks and liabilities arising out of TWE's use of Aries Marine's vessels. See id. at 3. Aries Marine required that TWE executed the Boarding Agreement before TWE and its subcontractor's personnel would be permitted to board the M/V Ram XVII to perform the core sample work. See id. The Boarding Agreement bears the signatures of TWE's Executive Vice President, Arthur J. Stephens, P.E. and Aries Marine's President and CEO, Courtney B. Ramsay. See id.

At the time of his December 2019 accident, Rose was employed by TWE's subcontractor, Amdrill. See id. at 4. Rose asserted claims against Aries Marine arising out of injuries sustained while working as a driller helper for Amdrill on the deck of the M/V Ram XVII in performance of the TWE/Amdrill Contract. See id. Rose initially sued Aries Marine and TWE in state court seeking recovery for personal injury damages. See Record Document 78-1 at 1–2. He also named Amdrill as a defendant in that litigation; however, Amdrill and the claims against it were later dismissed, as Rose settled all claims against Amdrill. See id. at 3.

Subsequently, Aries Marine filed this limitation of liability action seeking exoneration from or limitation of liability for the December 2019 accident, staying the state court proceeding, and seeking defense and indemnity from the M/V Ram XVII's time charter, LEI, and TWE. See Record Document 81-1 at 2. Rose filed a claim in the limitation proceeding asserting claims of unseaworthiness and negligence against TWE, LEI, and Aries Marine. See id. TWE, LEI, and Aries Marine then filed a Third-Party Complaint against Amdrill and its insurers based, in part, on Rose's claim of Jones Act seaman status. See id. Amdrill answered the Complaint, denying Rose is a Jones Act seaman and asserting a crossclaim against Rose based on the LHWCA settlement. See id. Aries Marine moves for summary judgment dismissing Rose's claims because he is covered by the provisions of the LHWCA, and his accident was caused by conditions over which Aries Marine had no control or duty to remedy. See id.

## LAW AND ANALYSIS

**I. Summary Judgment Standard.**

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56; see also Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2552–53. (1986). In applying this standard, the Court should construe "all facts and inferences in favor of the nonmoving party." Deshotel v. Wal-Mart La., L.L.C., 850 F.3d 742, 745 (5th Cir. 2017); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

3

As such, the party moving for summary judgment bears the burden of demonstrating that there is no genuine issue of material fact as to issues critical to trail that would result in the movant's entitlement to judgment in its favor, including identifying the relevant portions of pleadings and discovery. See Tubacex, Inc. v. M/V Risan, 45 F.3d 951, 954 (5th Cir. 1995). Courts must deny the moving party's motion for summary judgment if the movant fails to meet this burden. See id.

If the movant satisfies its burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." Id. (citing Celotex, 477 U.S. at 323, 106 S. Ct. 2553). In evaluating motions for summary judgment, courts must view all facts in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). There is no genuine issue for trial—and thus, a grant of summary judgment is warranted—when the record as a whole "could not lead a rational trier of fact to find for the moving party…." Id.

**II. Seaman Status, the Jones Act and the LHWCA.**

"Depending on the status of an injured worker and the allegedly responsible party, a maritime worker injured in the course and scope of his employment may bring an action under the Jones Act, the LHWCA, the general maritime law, or state law." Rutherford v. Pontchartrain Materials Corp., LLC, No. 23-2570, 2024 WL 1966428, at *4 (E.D. La. May 3, 2024). "The Jones Act permits a 'seaman injured in the course of employment…to bring a civil action at law, with the right of trial by jury, against the employer.'" Id. (quoting 46 U.S.C. § 30104). Additionally, a Jones Act seaman can "bring a claim against his employer for maintenance and cure and unseaworthiness." Id. "The LHWCA is a workers'

4

compensation system and the exclusive remedy available to 'a broad range of land-based maritime workers' who are injured in the course and scope of their employment but are not seaman and thus not entitled to sue under the Jones Act." Id. (quoting Chandris, Inc. v. Latsis, 515 U.S. 347, 355, 115 S. Ct. 2172 (1995) (citing 33 U.S.C. § 902(3)(G)). When a court is "'evaluating the employment-related connection of a maritime worker to a vessel in navigation, [it] should not employ a "snapshot" test for seaman status, inspecting only the situation as it exists at the instant of injury; a more enduring relationship is contemplated in the jurisprudence.'" Id. (quoting Chandris, 515 U.S. at 363, 115 S. Ct. 2172 (quotation and citation omitted)).

Since the term "seaman" is not expressly defined in the Jones Act, the courts have been tasked with defining the word "seaman." Id. at 273. The Fifth Circuit has adopted the two-part test established in Chandris to determine whether a maritime worker qualifies as a seaman: "(1) 'must contribute to the function of the vessel or to the accomplishment of its mission,' and (2) 'must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature.'" Id. (quoting In re Endeavor Marine Inc., 234 F. 3d 287, 290 (5th Cir. 2000) (citing Chandris, 515 U.S. at 368, 115 S. Ct. 2172 (1995)).

The first part of this test is considered a "threshold requirement," making anyone eligible for seaman status if they work at sea serving a ship. Id. The second part of the test consists of two elements: "the worker's connection must be 'substantial in term of both (1) its duration and (2) its nature.'" Id. "For the duration element, the 'rule of thumb for the ordinary case' is that '[a] worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman.'" Id. In Sanchez

5

v. Smart Fabricators of Tex., L.L.C., the Court created four factors to consider "when deciding whether a worker's connection to a vessel is substantial in nature." Id. The four factors are as follows:

> (1) the worker's exposure to "perils of the sea," meaning the hazards of a maritime working environment; (2) whether "the worker owe[s] his [or her] allegiance to the vessel, rather than simply to a shoreside employer"; (3) if his or her work is "sea-based or involve[s] seagoing activity"; and (4) whether "the worker's assignment to a vessel [is] limited to performance of a discrete task after which the worker's connection to the vessel end[s]," or whether he or she stays with the vessel.

Id. (quoting Sanchez, 997 F. 3d 564, 574 (2021)).

As stated above, a worker may bring a claim under the LHWCA in the alternative. Id. at 274. The LHWCA provides:

> a cause of action to a person injured by "negligence of a vessel," with the caveat that "[i]f such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel."

Id. at 275 (quoting 33 U.S.C. § 905(b)). There are three general duties shipowners owe to longshoremen: (1) turnover duty, which "relates to the condition of the ship upon the commencement of stevedoring operations; (2) "exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel'" after stevedoring operations have begun; and (3) duty to intervene, which "concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore." Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 98,

6

114 S. Ct. 2057, 2063 (1994) (quoting Scindia Steam Nav. Co. v. De los Santos, 451 U.S. 156, 167–78, 101 S. Ct. 1614, 1622–23 (1981)).

**III. Analysis.**

In its Motion, Aries Marine argues Rose is not a Jones Act seaman. See Record Document 81-1 at 5. Aries Marine uses relevant testimony to support its argument. See id. at 6. For example, Rose testifies he spent about 25 percent of his time working offshore and 75 percent on land while working as a driller helper for Amdrill. See id. Other than the two days leading up to and including the day of the incident, Aries Marine submits there is no evidence that Rose worked on a vessel or an identifiable fleet of vessels under Aries Marine's ownership or control. See id.

Aries Marine argues Rose is covered as a maritime worker under the LHWCA because he was injured on navigable waters. See id. Furthermore, Aries Marine contends Rose's negligence claim must be dismissed because Aries Marine did not breach its duty under LHWCA § 905(b). See id. The Aries Marine crew did not see Rose place his foot on the casing or have awareness of the chattering pipe. See id. at 7. Thus, Aries Marine asserts it had no duty to intervene in the Amdrill crew's operation. See id.

In his opposition, Rose asserts there are genuine issues of material fact as to whether he is a Jones Act seaman and, regardless of the outcome on his seaman status, there remain genuine issues of material fact precluding summary judgment on whether Aries Marine violated duties owed to Rose on its vessel. See Record Document 93 at 1. Rose cites to cases in which courts left the issue of seaman status under the Jones Act to the jury, except in exceptional circumstances. See id. at 8–9. Additionally, Rose argues

7

he qualifies under both parts of the Chandris test. See id. at 11. Under the second part specifically, Rose submits if he had not been injured, he would have spent at least two or three more months aboard the M/V Ram XVII. See id.

Alternatively, Rose contends that regardless of his seaman status, genuine issues of material fact exist regarding Aries Marine's liability. See id. at 12. Rose submits that the Amdrill and TWE workers were allowed to work on board the ship without any basic inspection, in which Rose avers violates the reasonable care required for persons on board. See id. at 13. Rose cites to Aries Marine employees' depositions, in which Rose claims both men disavowed any oversight or control over the crew working on the vessel. See id. Additionally, Rose argues there are genuine issues of material fact as to whether Aries Marine knew of the hazards posed by both the chattering drill pipe, as well as the condition of workers placing their feet alongside or on active drill equipment, and whether its claim that, because its crew was not paying attention, it should not be held liable for a violation of the turnover or intervention duties. See id. at 16.

Aries Marine replied, reiterating its Motion should be granted. See Record Document 102 at 6. Aries Marine states Rose lacks the requisite substantial durational connection to a vessel or fleet of vessels to qualify for seaman status. See id. Moreover, Rose's claims of negligence under § 905(b) should be dismissed. See id. Rose offers no evidence that any dangerous condition existed at the time Aries Marine turned its deck over to Rose and the Amdrill crew. See id. Aries Marine did not have a duty to intervene with respect to the conditions which arose during the Amdrill operations, and which related to the Amdrill equipment and operations. See id. Additionally, Aries Marine did not have a duty to supervise, inspect, monitor, or otherwise discover the conditions or to

8

anticipate their danger. See id. The Court will first take up the issue of whether Rose qualifies as a seaman under the Jones Act. Then, if the Court finds Rose does not qualify as a seaman under the Jones Act, the Court will discuss Aries Marine's duties to Rose under the LHWCA.

### (A) Seaman Status under the Jones Act.

When deciding whether Rose qualifies as a seaman under the Jones Act, "all relevant circumstances of [Rose's] situation must be considered." Phillips v. Javeler Marine Servs., LLC, No. 22-907, 2024 WL 2834460, at *3 (M.D. La. June 4, 2024). "[T]he presence of a 'vessel in navigation' is central to both prongs of the Chandris test." Id. Rose worked aboard the M/V Ram XVII, which was stationed off the coast of Texas. See Record Document 108 at 17. With no contrary argument from Aries Marine, the Court finds, for the purposes of summary judgment, the M/V Ram XVII was a vessel. See Phillips, 2024 WL 2834460, at *3.

Under the first prong of the Chandris test, Rose must put on evidence that he works at sea in the service of the M/V Ram XVII. Amdrill hired Rose as a driller helper. See Record Document 108 at 15. "A worker does not need to aid in the navigation of the vessel in order to be a seaman." Phillips, 2024 WL 2834460, at 3. While aboard the vessel, his duties consisted of loading material, making sure everything is clean, and supporting the driller with the trip pipe. See Record Document 108 at 15. The driller helper puts pipe on, takes pipe off, and makes sure it's clean. See id. at 15–16. Aries Marine does not contest the first prong of the Chandris test. Thus, the Court finds Rose has put on sufficient evidence to satisfy prong one. There is enough evidence showing Rose's duties contributed to the accomplishment of the M/V Ram XVII's mission.

The second prong of the Chandris test is contested. The first element under this prong is substantiality in duration. The Court is deciding whether Rose "'is a member of the [M/V Ram XVII's] crew or simply a land-based employee who happens to be working on the vessel at a given time.'" Phillips, 2024 WL 2834460, at *4. The Fifth Circuit has held "that '[w]here the worker divides his time between vessel and land, an employee can only establish the requisite connection to a vessel—and thus qualify as a seaman—if he spends a substantial portion of his time in service of the vessel.'" Id. In Chandris, the Court "adopted the Fifth Circuit's 30% rule of thumb: Where a worker divides his time between land-based and vessel-related service, '[a] worker who spends less than 30% of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act.'" Id. Until the incident, Rose claims he spent about 75 percent working onshore and 25 percent offshore. See Record Document 108 at 18. Rose had been on the job two days when the incident happened. See id. at 23. Two days does not add up to 30 percent. Like the plaintiff in Patterson v. Gulf Inland Contractors, Inc., Rose's "only additional support for his argument that the duration of his work on a vessel is in dispute is his own conclusory declaration of the same…." 682 F. Supp. 3d 641, 652 (E.D. La. 2023). Rose "provides no time sheets, hours log, employment records, or other evidence to bolster his own conclusory statements." Id. These conclusory statements do not create a genuine issue of material fact to overcome summary judgment.

The second element of prong two requires substantiality in nature. Rose must put on evidence that he has "a sufficiently substantial connection to [the M/V Ram XVII] to qualify him as a Jones Act seaman." Crochet v. Morton Salt, Inc., 433 F. Supp. 3d 977, 987 (W.D. La. 2020). Like the plaintiff in Crochet, Rose did not work exclusively on Aries

10

Marine's vessels or sail with the M/V Ram XVII once the drilling was finished. Id. Rather, Rose works exclusively for drilling companies, like Amdrill, who board vessels to conduct their operations. In Crochet, the district court found the plaintiff did not qualify as a seaman under the Jones Act because he only went out on vessels occasionally and was an employee of a land-based entity rather than the owner of the vessel. Id. The same can be said for Rose; therefore, he fails to meet prong two of the Chandris test. The Court finds that Rose does not qualify as a Jones Act seaman. There are no genuine issues of material fact to the contrary. Thus, the Court will proceed to its analysis of whether Aries Marine owed or breached any of the three Scindia duties under the LHWCA.

### (B) The Three Scindia Duties under the LHWCA.

Under the LHWCA, Rose claims Aries Marine violated all three of its Scindia duties: turnover duty, active control duty, and duty to intervene. See Record Document 93 at 14. Rose asserts that as a vessel owner, Aries Marine owed a duty to Rose to provide a safe workplace. See id. at 15. Rose alleges the condition of the increasing chattering with the pipe and slip ring was known to everyone on the deck of the M/V Ram XVII. See id. Additionally, Rose contends Aries Marine cannot claim that its workers were not aware of the risks associated with the work. See id. at 16. He supports his contentions with the fact that the Aries Marine crew led safety meetings with everyone on the vessel. See id.

The Court will analyze each Scindia duty. The turnover duty consists of two different but related obligations. Hamilton v. Targa Transp. LLC, No. 16-2614, 2018 WL 2010294, at *3 (S.D. Tex. Apr. 30, 2018). "First, the owner owes a duty to exercise

11

ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert and experienced stevedore can carry on stevedoring operations with reasonable safety." Id. The second obligation provides, "the owner owes a duty to warn the stevedore of latent or hidden dangers that are known to the vessel owner or should have been known to it." Id. However, this obligation "does not include dangers which are either: (1) open and obvious or (2) dangers a reasonably competent stevedore should anticipate encountering." Id.

The active control duty requires the vessel owner to "'exercise due care to avoid exposing longshoremen to harm from hazards that they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.'" Id. at *7 (quoting Manson Gulf, L.L.C. v. Modern Am. Recycling Serv., Inc., 878 F. 3d 130, 134 (5th Cir. 2017) (quoting Scindia, 451 U.S. at 167; Howlett, 512 U.S. at 98)). The main question "'is whether the work area in question has been "turned over" to the contractor.'" Id. (quoting Romero v. Cajun Stabilizing Boats Inc., 307 Fed. Appx. 849, 851 (5th Cir. 2009)).

The duty to intervene imposes liability on the vessel owner if it does not intervene when it has actual knowledge of the hazards and "'"that the stevedore, in the exercise of obviously improvident judgment means to work on in the face of its and therefore cannot be relied on to remedy it."'" Id. at *8 (quoting Manson Gulf, 878 F. 3d at 134 (quoting Burchett v. Cargill, Inc., 48 F. 3d 173, 178 (5th Cir. 1995) (internal quotation marks omitted)).

12

After analyzing the summary judgment record, the Court finds there are no genuine issues of material fact on this issue, and Aries Marine did not breach any of its Scindia duties owed to Rose. Chris Osborne ("Osborne"), Joshua Phillips ("Phillips"), Rose, and Kendall Jones ("Jones") provide deposition testimony supporting the Court's finding for summary judgment.

Osborne, the Amdrill employee operating as a driller aboard the M/V Ram XVII, provides testimony aiding in the Court's determination. See Record Document 108 at 21; see also Record Document 81-6. Osborne states he has no "reason to believe anyone from Aries [Marine] knew there was chatter from the casing" because there were not in a position to observe the casing. See Record Document 81-6 at 9. Osborne also provides that Aries Marine would not have known about Rose putting his foot on the casing head or been in a position to observe it. See id. at 9–10. At the time of Rose's incident, no Aries Marine crewmen were on the deck. See id. at 8. Osborne confirms it was his deck, he handled the drilling, and he expected everyone to steer clear of the equipment. See id. Aries Marine did not participate "in any kind of supervisory role with…how the drilling crew did their job." See id. at 8–9.

Joshua Phillips's ("Phillips"), the Amdrill employee operating as the other driller helper aboard the M/V Ram XVII, provides deposition testimony that supports the Court's finding for summary judgment. See Record Document 108 at 22; see also Record Document 81-8. Phillips testifies that the M/V Ram XVII was in a safe condition allowing him to perform his job safely; there was nothing in his way on the vessel. See Record Document 81-8 at 6. Furthermore, Phillips states that "nothing having to do with the vessel or its equipment had anything to do with the accident in his opinion." See id. Like Osborne,

13

Phillips testifies that no one "from the Aries Marine crew [could] have seen [Rose] put his foot on [the] casing." See id. at 7. In fact, the Aries Marine crew "was instructed to stay clear of [Amdrill's] equipment when [Amdrill was] operating." See id. at 6. Aries Marine did not play an active role in the drilling operations, nor did it supervise the Amdrill crew. See id. at 7.

Rose's deposition testimony also supports summary judgment. See Record Document 108. Rose testifies there were no problems before the incident occurred. See id. at 31. In fact, Amdrill owned the drilling equipment that was being used by Rose, Phillips, and Osborne. See id. Amdrill employees maintained the equipment every day. See id. at 31–32. Kendall Jones ("Jones"), an Amdrill employee a part of the drilling crew, was the person in charge of supervising the drilling crews. See id. at 16–17. Rose confirms that besides the weather, the Aries Marine crew was not "aware of anything occurring leading up to the accident that would cause them to need to stop the operation." See id. at 41–42. In fact, Rose agrees that if someone from Aries Marine had been on the deck at the time of the incident, the only thing they could have done to prevent the incident was stop because the weather was deteriorating. See id. at 79. However, Rose is unsure whether anyone informed the Aries Marine crew that the weather was affecting the drilling. See id. at 42.

When asked where the Aries Marine crew was during the time of the incident, Rose states that "the captain was probably wherever the captain sits upstairs, and [] Josh Long was just somewhere on the deck." See id. at 30. Rose cannot recall what Josh Long's ("Long") purpose was on deck or specify his location on deck. See id. There is no other testimony or evidence stating Long was on deck during the time of Rose's incident. These

14

Aries Marine crew members did not play a role in Amdrill's operations with the drilling crew. See id. While Rose believes "Aries Marine had the authority to stop the job if they felt it was unsafe," he does not specify what Aries Marine could have done differently. See id. at 41. No one from the Aries Marine crew participated in the drilling operations. Amdrill appears to be solely in control of these operations. Thus, Rose's speculative conclusory statements about what Aries Marine should have done is insufficient to overcome summary judgment.

Additionally, Jones, an Amdrill employee working as part of the drilling crew aboard the M/V Ram XVII, provides relevant testimony. See Record Document 108 at 17; see also Record Document 81-4. Jones confirms Osborne made decisions on operations as the foreman of the night crew, but Jones oversaw everything as the field supervisor. See Record Document 81-4 at 5. While the captain of the M/V Ram XVII, Octave Parfait ("Parfait"), mostly stays up by his wheelhouse and can "see everything three-quarters time what's going on [on the deck]," there is no evidence Parfait oversaw the drilling operations. See Record Document 81-5 at 2. The summary judgment evidence illustrates that Jones was the main person supervising the Amdrill crew, which includes Rose.

From the above testimony, the Court finds Aries Marine did not breach any duties owed to Rose. There is no summary judgment evidence showing that Aries Marine did not exercise ordinary care when it turned over the M/V Ram XVII to Amdrill. Amdrill used its own equipment; the only thing Aries Marine supplied was the vessel. Additionally, there is no evidence Aries Marine knew of a hidden danger or the problems with the casing. Aries Marine did not have notice or knowledge of the danger which caused the incident. In fact, there is no sufficient evidence to demonstrate any Aries Marine crew member was

present on the deck at the time of Rose's incident. Furthermore, no testimony can clearly point to what caused Rose's incident with the casing. The Court finds there are no genuine issues of material fact as to whether Aries Marine breached the duties under the LHWCA.

## CONCLUSION

For the reasons stated above,

**IT IS ORDERED** that Aries Marine's Motion for Summary Judgment (Record Document 81) is **GRANTED**. Therefore, Rose's claims asserted against Aries Marine are **DISMISSED WITH PREJUDICE**.

An Order consistent with this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED,** in Shreveport, Louisiana, this 11th day of December, 2024.

_____
UNITED STATES DISTRICT COURT JUDGE